Mr. Don Collins for the appellant and Mr. Tim Ting for the athlete. Mr. Collins, you may proceed when you're prepared to. We don't need to come up. You can sit back. You can be seated at the council table if you wish. May it please the court. Arguments are brief in this case. I'm not going to need 20 minutes for this. I just want to briefly go through this quickly with you. Mr. Louis Dandrade apparently received two counts, two charges for disorderly conduct from an incident arising out of June 10, 2010. One count, this came to trial on September 13, and the court found him guilty by allowing him to get course revision on one of the charges, the Fairview Heights charge. The other charge was found not guilty. But they were the same charges, essentially, weren't they? Well, it was two separate charges. My argument was there probably should have just been one charge instead of two, but there was two charges. The state's attorney said there was two separate charges, and we went to trial on those two charges. But anyway, on the complaint that the court allowed the finding of guilt, it's from Fairview Heights. And it says the allegation was that the defendant followed Amanda Hearst from Belleville to Fairview Heights Walgreens and honked his horn and yelled at Ms. Amanda Hearst in such an unreasonable manner as to alarm and disturb her. That was the allegation in the citation complaint by Fairview Heights. And it allegedly happened on June 10, 2010 at 10.36 a.m. Now, of course, disorderly conduct was defined by statute as a person commits disorderly conduct when he knowingly does any act in such an unreasonable manner as to alarm or disturb another and to draw a breach of the peace. So it was very short testimony offered by the state's attorney on this. In the record, I think it's basically on pages 10, 11, and 12, where the only witness they called was Ms. Amanda Hearst. And there's no doubt that the victim here told her client to stay away a number of times. I would just like to point out, certainly she said that, but she also made contradictory comments, too, in the sense that she claimed that she told him that several times for a whole month or so. But then she also admits that she approximately a week before this incident happened on June 3rd, she's calling him up asking, what are you doing? And she invites him over to his house, and they watch a couple movies together. So after she tells him to stay away, she invites him back. So if that's the case, if she really did that, then how is he supposed to interpret that? A week before, she's inviting himself over to his place, and then they get together two days before this incident, too. So to me, I don't think they can give much weight to that testimony that she said she told him several times. But then she comes back and then admits, yeah, I went over there and we socialized, we watched a couple movies together. I did get upset with him later because he was playing with my phone. So she left without her phone, and then he brought the phone back to her right away. So I don't know how much the court can weigh in the testimony how much weight to give them. And then also she admits that two days before this incident, he came over to the house, and again they socialized, and they were somewhat drinking. I think he testified that he had about a half a beer, and she claimed she had a couple drinks. She thought she had more than a couple, two drinks. But again, they were together for about four hours two days before this incident. So I don't know how much weight you can really say why he told him not to come over and not announce it, whatever. And the statute doesn't just say that it alarms or disturbs somebody. It says in such an unreasonable manner to alarm or disturb. So I guess my next question would be about waiting in a hallway when you've been told not to come around or parking your car behind her car. Isn't that unreasonable? Well, again, the question is how much weight to the testimony you give to her saying that I told him not to come around when she's over at his place a week before that, and then they're together two days before that. And then the question is unreasonable if he says, well, he thought she was mad at him, and he brought over a teddy bear and some flowers, and he was going to leave it to her and try to talk to her to make sure she wasn't upset or mad at him. And then the only thing, in that particular incident at the time, she says, do not touch me. That's all the words she says. She doesn't say go away. I told you not to be here. If you don't leave, I'm going to call police. She said, do not touch me. He gets to the side and lets her walk by. There was no contact. She didn't talk with him at all other than he was trying to talk with her. So, I mean, what's reasonable and unreasonable under those circumstances? You know, what would a reasonable person do at that particular time? Okay, and then so you go in, and if you're going by the alleged complaint that the judge was going by, the complaint was following her out to Fairview Heights. You know, this was the daytime. It wasn't like, you know, you've got these other cases where one guy is going over to an older lady's house and pointing a finger and threatening, intimidating her. You know, if you do, testify against my brother, dah, dah, dah. You know, it wasn't, there was no, in any of this, there was no intimidation whatsoever. At the Walgreens parking lot incident, was the car still parked when the police arrived? The record, as far as I can tell, the record says that as soon as my client, apparently she called the police on her way out to Walgreens. Right. As soon as my guy pulled into the parking lot, the police pulled in immediately right behind him. That's what the record indicates to me. So, so the question is, well, is he being unreasonable by following her out to work? It's daytime. You know, whether it's 10 a.m., 10.30 a.m., it's daytime. He's not, there's nothing to indicate that he's speeding or she's speeding, nothing that she's trying to evade him and he's trying to keep up with her. It's just that one time she said, well, when I changed lanes, he changed the lane too. That's all it says. It doesn't say he was driving recklessly. No testimony by either party that they were doing nothing but the regular speed to get out there, five miles. You would assume that that was about seven, seven or eight minutes for them to go five miles from Belleville to Fairview Heights to the Walgreens. And so he followed her out there. And then the only thing that comes out there, you know, the state's attorney in their closing trying to say, well, he yelled at her or whatever. But the testimony on that is clear, too. On the record on page 12, the state's attorney was asked, was he yelling? And he said, she said, the blinding witness said, it looked like he was talking, but I couldn't tell. And then the state's attorney on page 12 on line 1560, did he honk his horn? She says, I don't remember if he honks his horn. It's possible, but I don't remember him, his horn. So, I mean, the two main allegations of what they're trying to say that he was doing another reason why manners said she didn't, it didn't happen or she doesn't recall him. So what about whether or not he was walking her egress? And again, on that, I'd like to bring up the report with the record reflects. Her testimony says that as soon as he pulled up, he's pulled up right behind him. She claims she didn't think she could get out. Mr. Dan Gray did testify on this. And he said he pulled into the general parking lot area, not into parking spaces to get with her. And he did not block her in. There was a lot of reasonable room for her to get out. And then he also said that when he was attempting to talk to her at that point in time, he said he pulled, he didn't roll down the window, he says he pulled down the window. And he says that, you know, I just want to talk. Okay. And then when she didn't respond at the time, he said that she was approximately 10 feet away from him. And then he said he opened the door and he said, I just want to talk to you. That's all he said. There was no testimony by either party. He was yelling, screaming anyway, intimidating her in any form or fashion. So, I mean, the evidence just was not there. You know, it doesn't, you know, whether it's a prior fact of the judge or jury, the evidence was not there. And, I mean, cases said evidence is so improper and unsatisfactory that there remains a reasonable doubt about the defendant's guilt. Of course, it's the state's burden to prove each and every element beyond a reasonable doubt. And there was no evidence, insufficient evidence to convict my client of this particular case. And it says when he normally does any act in such unreasonable manner, it's just not there. Now, obviously, she was upset or mad. He thought she was mad at him, and that's why he came over there trying to talk to her. But we're not talking about some cases, 2 or 3 o'clock in the morning, you go over and yell and start screaming. This is disorderly conduct. Go over there, he starts to threaten her, intimidate her. That's disorderly conduct. But he didn't do anything other than if it's someone that you know, he considered her a friend, a girlfriend, that he was willing to try to talk with her. And he did not do anything to really force the issue other than, hey, I just want to talk to you. You know, he would just ask for a short minute of time. I mean, you know, certainly we don't want to get in a situation that, you know, someone claims that, well, you know, the way, you know, you looked at me, and, you know, I didn't like your smile, I think that's disorderly conduct or something like that. You know, I think it's, you know, we could take it to the extreme. And there's nothing in the case that's any threatening, intimidating, acting any unreasonable in any form or fashion in this particular case. Any other questions? I don't think so. Thank you, Mr. Pollenhill, for the opportunity for rebuttal. Mr. Ting. May it please the Court. My name is Timothy James Ting, and I represent the people of the state of Illinois. Your Honors, in my time before this Court, I will show you why the defendant's conviction for disorderly conduct should be affirmed. Your Honors, as the defendant stated, really what we're looking at is a statutory definition of what disorderly conduct is, which isn't that helpful? Knowingly acting in such an unreasonable manner as to alarm, disturb, and provoke a breach of peace. Now, case law stated these types of conduct, of disorderly conduct, almost defy definition. You can find that in the verse of Chicago State. So therefore, what we look to, as People v. Cooper has directed us, is to determine the reasonableness of the conduct in relation to the surrounding circumstances. When all the legalese is cast aside, what this means is looking at the actions of the defendant. And whether those actions speak louder than any defendant's words speak to the contrary. Now here, if we look at the reasonably prudent person looking at the facts of this case, this is what we find. As Justice Blackson has stated, there is no doubt in the record that Ms. Hearst told the defendant multiple times to stay away. You can find this on pages 8 of the record, 28 of the record. She says more than a dozen and 13 of the record. But also she's told him they reconnected after she did that. Absolutely, and that's a legitimate point to make. But here is where the defendant conveniently ignores the real crux context of this issue. On June 8, two days before the alleged disorderly conduct occurred, this is what occurred. And this is the defendant's testimony that you can find on pages 60 through 64 of the record. The defendant states, and I quote, I was trying to talk to her about that situation. Wanted to get the story straight because she thinks I raped her. That's why he was going over to Ms. Hearst's house on June 10. Again, the defendant, while he claims that the sex was consensual, the defendant admitted during his testimony in trial, again on 63 and 64 of the record… …that there was alcohol involved and that she said stop during the intercourse. Now, when we are provided with that context, surely, regardless of whether or not anything had occurred before where there may have been mixed messages… …when Ms. Hearst said stop during sexual intercourse, in addition to all the multiple times where she had said leave me alone… …this would have been the instance where the defendant says this relationship has ended. There is no longer any point to go towards her or to have any contact with her. However, on June 10, the defendant knocked on Ms. Hearst's door multiple times. Multiple times. Now, after this happened, what happened? Well, Ms. Hearst got out of her apartment, went downstairs, and found the defendant, as Justice Wexton, as you stated, again, waiting for her in the hall. Now, is this reasonable? Under certain circumstances, this may be reasonable. If it's an old buddy from college and he's waiting to meet with his old buddy, maybe there could be a reasonable circumstance. Not in the instance where there's an allegation of rape. This is a case where that is unreasonable for the alleged rapist to then wait in the hallway for his victim. Then Ms. Hearst says to the defendant, go away – or she says, I'm sorry, don't touch me. Now, the defendant even corroborates this testimony that he heard. He says, and I quote, she said don't touch me. She seemed a little – she seemed upset or something. You can find this on page 52 of the record. Mr. Ting, then what translates into breach of the peace, assuming all that took place? The breach of the peace is certainly Ms. Hearst's ability to perform her daily functions without the encumbrance of the defendant's actions. She went to Walgreens to work. And during her trip there, the defendant changed lanes and followed her. Once she arrived at work, the defendant parked his car behind her so that she could not effectively move her vehicle. That encumbered her ability to go to work. I thought she was getting out of her vehicle and walking into the building. But if the car is in front of her, surely we have to look at the logical corollary of this. Even if she's not moving her car anymore and she just is no longer using that car, she still needs to walk away. And the only way to walk towards Walgreens would be to walk towards the defendant, who she – as she quoted, does not want to touch her. So surely this is breaching her peace. I would point this forward specifically to the case that I cited in my brief, People v. Davis, which is the most analogous case that we can find. Here, there was a longstanding feud between the defendant and the victim. And the defendant did not like the way that the victim had driven. You can find this on 291 Hill Ave. 3D 552 cited in my brief. At one point, the defendant sees the victim. He gets to an intersection. He stops, parks his car at the intersection. The victim is behind him. Another car is going along the intersection, stopping, and essentially locks the victim in between the defendant's car, the victim's car, and a pedestrian's car. The defendant then gets out of his vehicle, walks towards the victim's car, and begins to lecture her about her driving. But don't you see a difference? Here she's abandoned her car. The car has no utility to her at all when she's going to work. She doesn't even know what he's saying, but she thinks he was saying something. She couldn't hear it. There is no distinction here as far as what the breach of peace means to that victim. In both instances, whether the defendant is approaching the victim directly, as in Davis, or whether the only way the victim can get to her destination is to go through the defendant, the defendant is blocking the way of the victim. Regardless of the functionality of the car, that is a consequential. What is consequential is how the victim can go about her daily life without the encumbrance of the defendant. And when the defendant blocks the way, makes some sort of definitive action that shows or designates to the victim that they cannot enjoy their peace, so to speak, without being encumbered by the defendant. And this is surely the instance that the statute was defined. And I would quote from the Davis court that – the Davis court said, and I quote, Defendant's actions, blocking the plaintiff's way of the car, forcing her to remain behind him in the car, approaching her car, and forcing her to listen to his comments about their disagreements and their driving habits, placed in the context of their previous relationship, was a form of harassment sufficient to constitute a breach of peace. Again, you have to look at the context of the situation leading up to these events. When you look at that, you see that there is an allegation, at least in the defendant's mind, that he had raped the victim. Surely, surely, if there is that serious of an allegation that the defendant thinks, when the victim says clearly, when his first said, don't touch me, and runs to her car, gets in her car, drives forward, and the defendant methodically changes lanes and follows her. There is some ambiguity whether or not he harmed her or not. The state won't say that he did. But what we will say is that the record is very clear that he changed lanes when she changed lanes. And he clearly parked behind her. Again, there may be some ambiguity in the record whether or not he fully parked behind her and that she couldn't back her car out or whether he parked to such an extent that she could still back her car out. That is inconsequential as well. What is consequential is that the victim had to go through the defendant to get to her place of work, a person that she clearly did not want to see and did not want to touch her. That is breach of the peace. And I would point this forward to the language in People v. Allen. The prescribed conduct must only be voluntary, unnecessary, and contrary to ordinary human conduct. If Ms. Peirce's multiple demands to leave her alone were not enough or the significance of the June 8th instance when they were having sexual intercourse and she said stop, if that wasn't enough, then when she left her apartment and said don't touch me and went into her car, that should have been an instance. But still, the defendant continued to follow her, park his car behind her, and then the police arrived. And I would point this forward to one more thing. We have to always understand that on appeal, this court's job is not to retry the defendant, particularly on sufficiency of the evidence case. On sufficiency of the evidence review, it is resolved in the light most favorable to the state. So any ambiguity, any type of weight given to testimony by the trial court should be credited toward the trial court's interpretation and ruling. Because the trial court, as has been stated in countless cases, is in the best position to accurately determine the witness's testimony because they are there. They see what the witnesses are saying. They see the mannerisms. They see things that cannot accurately be portrayed in black and white, in just words. To your honors, given all of that, I would urge this court to affirm the defendant's conviction for disorderly conduct. Do you have any questions? No, thank you, Mr. King. Mr. Collins, rebuttal. Of course, we're not before the court today on a bill for any rape conviction or attempted rape conviction. We understand that. And, you know, we're just here on disorderly conduct and trying to influence this court on something. Anything that happened to them the two days before is not really relevant to what's before the court right now. I mean, the only comment that, you know, Amanda Hearst did not testify about anything that happened that night or brought it up. There's no charges or anything of that nature. The only thing that was said by my client about that incident two days before is she came out of the bathroom totally naked and he asked, does that mean what I think it means? And they apparently were starting to have sex and she asked him to stop and at some point in time he stopped. That's the only thing we know about the record of that. But he felt that she was mad at him, so she was one to try to clarify that matter. Now, nothing was said on this particular day on June 10th. In fact, she said she didn't talk. She didn't say, what are you doing here? Go away. I told you not to be here before. In fact, she said that, okay, before too. He claims that that has not been mentioned to him before in his testimony. The incident in issue, the police, Fairview Heights police officer didn't even talk to get his version. They only got one version and allowed her to sign the complaint. But what they complained about, the honking and the yelling, it didn't take place. There's no evidence of it whatsoever. The, there was no demands made on her on that day to, you know, her complaint. Said, well, leave me alone. All she said is, don't touch me. That's the only evidence we have. And the evidence clearly shows that he, you know, moved the side of the stairway and let her go by without doing anything whatsoever other than trying to go out and try to talk to her. And then when she left to go to work, he tried to go spend five to eight minutes to get out there and work to say, hey, I just want to talk with you. And that's all he did. And we're talking about daytime. We're talking about no reckless driving or rational driving other than him being trying to be calm and seeing a friend that he thinks is upset. He's going to talk. The elements are not there. For that reason, we're asking the court to reverse the trial of the judge and make an entry of not guilty. Thank you. Thank you, Mr. Collins. Thank you, Mr. Ting. We'll take the matter under advisement.